Filed 2/27/19; Modified and Certified for Partial Publication 3/27/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FARMERS & MERCHANTS TRUST COMPANY, as Trustee, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> YURI VANETIK et al., <br><br> Defendants and Appellants. | G053688 (consol. with G053689, G054218) <br><br> (Super. Ct. No. 30-2013-00688150) |
| FARMERS & MERCHANTS TRUST COMPANY, as Trustee, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RICHARD WEED et al., <br><br> Defendants and Appellants. | G053978 <br><br> (Super. Ct. No. 30-2013-00688150) <br><br> O P I N I O N |

Appeals from judgments and postjudgment orders of the Superior Court of Orange County, Ronald L. Bauer, Judge. Appeal Nos. G053688 and G053689 affirmed in part and reversed in part. Appeal No. G053978 affirmed. Cross-appeal in appeal No. G053978 dismissed as moot. Appeal No. G054218 affirmed. Motion to augment appellate record. Denied.

Klapach & Klapach and Joseph S. Klapach for Defendant and Appellant Yuri Vanetik.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup; Hamilton Law Offices and John Michael Hamilton for Defendant and Appellant Anatoly Vanetik.

Law Office of Jim P. Mahacek and Jim P. Mahacek for Plaintiff and Appellant Farmers and Merchants Trust Company.

White & Reed and Michael R. White for Defendants and Appellants Richard Weed, Weed & Co., L.C., and Weed & Co. LLP.

\*　　　\*　　　\*

INTRODUCTION

Yuri Vanetik and his father, Anatoly (Tony) Vanetik, were involved with a number of interrelated companies in the business of oil exploration in Russia.  (To avoid confusion, we will refer to Yuri and Tony by their first names; we intend no disrespect.)  Yuri approached his friend, Elliot Broidy, about investing in one of those companies, Terra Resources (Terra).  Broidy agreed to invest $750,000, with the written agreement his investment would go only to efforts to start production on the oil wells.

Farmers & Merchants Trust Company (F&M Trust) was the trustee and administrator of the simplified employee pension plan (SEP) for Broidy's individual retirement account (IRA).  F&M Trust acquired stock in Terra.  Broidy later learned that his investment had not been used in connection with the oil wells.  Rather, the money had been used to pay off Yuri's and Tony's preexisting debts.

Broidy and Tony orally agreed that Tony would pay back the $750,000; Tony failed to do so.  F&M Trust then sued Yuri and Tony for breach of written and oral contracts, and for fraud.  F&M Trust also sued Richard Weed (the attorney for Yuri, Tony, and the oil exploration companies) for fraud.  (Weed and his law firm, at different times known as Weed & Company, L.C., and Weed & Company LLP, will be referred to collectively in this opinion as the Weed defendants.)  The jury found in favor of F&M Trust on all causes of action, and awarded compensatory and punitive damages against Yuri, Tony, and the Weed defendants.  Judgment was entered against Yuri and

2

Tony; the trial court granted judgment notwithstanding the verdict (JNOV) in favor of the Weed defendants.

On appeal, we conclude that substantial evidence supported the jury's verdict against Yuri and Tony on the claims for breach of written contract, breach of oral contract, and fraud. The jury's special verdict findings on the contract and fraud claims neither resulted in inconsistent verdicts, nor required F&M Trust to make an election of remedies. However, F&M Trust failed to offer substantial evidence supporting the punitive damages awards against Tony and Yuri. We reverse those punitive damage awards, but otherwise affirm the judgment in favor of F&M Trust and against the Vanetiks.

We further conclude the trial court properly granted JNOV in favor of the Weed defendants on the fraud causes of action. There was no evidence that the Weed defendants had an independent duty to F&M Trust, or that their actions went beyond the ordinary performance of professional duties as the Vanetiks' legal counsel. We therefore affirm the judgment in favor of the Weed defendants and against F&M Trust.

We further affirm the postjudgment orders awarding attorney fees to F&M Trust as the prevailing party on its judgment against Yuri and Tony, and awarding attorney fees to the Weed defendants as the prevailing parties on their judgment against F&M Trust.

STATEMENT OF FACTS

Elbrus Energy Group, Ltd. (Elbrus) was formed by Tony, Alex Sulla, Jed Dolkart, and Dean Miller in 2009 to acquire and develop oil concessions in Kalmykia, Russia. (A concession is a right to remove oil with the government receiving some of the income.) Yuri helped capitalize the company by providing $750,000 in startup funds. Terra was established to own the equity of Elbrus and facilitate the raising of capital and the addition of new shareholders.

3

Broidy was a friend of Yuri's. In late 2010, Yuri informed Broidy of Terra's oil exploration business in Russia. Broidy decided to invest $750,000 in Terra.

Broidy performed due diligence before making his investment, hiring an international oil and gas consulting company called Pace Global to investigate Terra's oil concessions. Pace Global advised that it was "comfortable" with the deal and "felt there was oil there and time would tell whether we could extract." Pace Global also advised Broidy that it did not see any "fatal flaws" and thought there could be significant reserves of oil in the concessions. Pace Global described the investment as an extremely high-risk investment: "While that may lead to higher returns, it is critical to understand that these fields are much higher risk and could be technically challenging."

Broidy wanted his investment to go strictly into uncapping the wells and making them productive. The securities purchase agreement specified: "SELLER covenants to use funds from Initial Purchase in furtherance of efforts to start production on the 85,000 acre Concession in Kalmykia owned by NK Alliance LLP." Broidy was willing to accept the risk that the wells might not produce any oil. Yuri told Broidy that his $750,000 investment would uncap some of the wells, although Yuri knew that the true cost of uncapping a single well could be in excess of $1.5 million. The Vanetiks told Broidy that Terra was financially stable. Broidy would not have invested in Terra if he had known about the amount of debt it was carrying. The Vanetiks did not tell Broidy they had personal financial claims against Terra.

Broidy acquired his Terra stock from KLEL Funds (KLEL), a subsidiary of Terra. Broidy was told the Vanetiks controlled KLEL, and the transaction was being run through KLEL as an accommodation to the Vanetiks. The stock was sold to F&M Trust as the trustee and administrator of Broidy's SEP IRA, rather than directly to Broidy. Broidy's attorney, David Camel, prepared the purchase documents with Weed, who was acting as counsel for Terra and KLEL.

4

On March 11, 2011, Broidy and KLEL executed a securities purchase agreement. Neither Tony nor Yuri nor any of the Weed defendants were signatories of the securities purchase agreement.

Concurrently with the securities purchase agreement, Broidy and KLEL executed an escrow agreement with Weed & Company LLP to facilitate the stock transfer. Neither Tony nor Yuri was a signatory to the escrow agreement.

Broidy's investment was used by Terra to repay loans, reimburse expenses, and pay operating expenses; none of Broidy's investment was used directly to develop the oil concessions.

Yuri advised Broidy that things were going well, wells were being uncapped, and Terra had contracted with Baker Hughes, the oil development company that would supervise the project and manage the capital. Baker Hughes, however, had not been paid.

Terra's brokerage firm in Germany, Euroline Bankers, owed a custodian fee to Baader Bank, Terra's custodial bank. Baader Bank liquidated a large quantity of Terra's stock to satisfy the debt, seriously depressing the value of Terra's stock. Terra was later delisted from the Frankfurt Stock Exchange. Both Yuri and Miller sold their Terra stock.

In 2013, Broidy advised Yuri and Tony he was unhappy with his Terra investment. According to Broidy, Tony said "he was going to give me my money back." Tony also told Broidy: "I promise you you won't lose one penny. I'm going to give you your money back." Yuri told Broidy: "It's up to my father. I think my father will make it right."

In June 2013, Camel and Weed exchanged a series of e-mails regarding a proposed settlement. Camel forwarded a proposed stock purchase agreement to Weed. The accompanying e-mail read, in relevant part: "Following up our conversation earlier today, attached is a Stock Purchase Agreement along with a draft letter cancelling the

5

Option.  Please let me know if you have any comments regarding the Agreement or the letter.  Also, please send me the name of the buyer and when your client can close.  [¶] My client is concurrently reviewing the documents and they are subject to his review, comment and approval."

On June 17, Camel wrote to Weed:  "It has been ten days since I last heard from you, 14 days from when the Stock Purchase Agreement was first sent to you and over six weeks from when our clients first addressed this matter.  [¶] If we are going to successfully resolve this matter without the involvement of litigation attorneys, we need to have an executed Agreement by the end of this week along with an initial minimum payment of $250,000.  Please contact your client and let me know if that is going to happen.  If not, per my previous emails, my client will direct his litigation counsel at Latham & Watkins to vigorously pursue all rights and remedies on his behalf against all parties."

On July 25, 2013, Broidy e-mailed Tony:  "While I truly appreciate your repeated assurances that you will buy out my Terra shares at cost of $750,000, you are moving far too slowly.  Please instruct your attorney Rick Weed to complete and deliver the executed note and associated documents today.  I require a $250k down payment by the 31st of July and the balance of $500k by Aug 15th.  . . . I have been more than patient.  It is now time for you to perform.  Thank you in advance for making this happen."  The repurchase of Broidy's stock never occurred.

PROCEDURAL HISTORY

F&M Trust, as administrator and trustee of Broidy's SEP IRA, initiated the lawsuit in November 2013.  The operative first amended complaint asserted causes of action for breach of a written contract, breach of the covenant of good faith and fair

6

dealing, negligent misrepresentation, fraud, negligence, constructive fraud, breach of fiduciary duty, unfair competition, and for an accounting.[1]

Shortly before the scheduled trial date, F&M Trust sought leave to amend to file a second amended complaint. F&M Trust proposed adding, among other things, a cause of action for breach of oral contract based, in part, on the alleged promises of Terra, Tony, and Yuri to pay Broidy back his $750,000 investment. The trial court denied the motion for leave to amend.

The case proceeded to trial before a jury, with certain matters bifurcated for a later bench trial. After all parties had rested their cases before the jury, F&M Trust made an oral motion to amend the complaint to add a cause of action against Yuri and Tony for breach of an oral contract—the agreement between Broidy and the Vanetiks in 2013 to buy back Broidy's Terra stock for $750,000. The court granted the motion to amend.

The Weed defendants then made a motion for nonsuit of the cause of action against them for breach of the securities purchase agreement. The trial court granted the motion because the Weed defendants were not parties to that agreement.

The jury rendered a special verdict finding:

1. Yuri and Tony breached the written securities purchase agreement;

2. Yuri and Tony breached the oral contract to repay F&M Trust;

3. None of the defendants was liable for negligent misrepresentation;

4. All defendants made false representations, intentionally concealed facts, and made false promises;

5. All defendants violated Business and Professions Code section 17200;

---

[1] The causes of action for negligence, constructive fraud, and breach of fiduciary duty were alleged only against the Weed defendants; all other causes of action were alleged against all defendants. A cause of action for violations of the Corporations Code was withdrawn by F&M Trust during trial.

7

6. F&M Trust suffered compensatory damages in the amount of $750,000; and

7. By clear and convincing evidence, all defendants engaged in the conduct underlying the causes of action for intentional misrepresentation, fraudulent concealment, and false promise with malice, oppression, or fraud.

After a second phase of the trial, the jury found that F&M Trust was entitled to recover punitive damages from all defendants in the following amounts:

1. Yuri: $2,000,000

2. Tony: $1,250,000

3. Richard Weed: $110,000

4. Weed & Co., LLP: $1

5. Weed & Co., L.C.: $1

The court then conducted a bench trial on the causes of action for breach of fiduciary duty, constructive fraud, and breach of the escrow agreement against the Weed defendants. The court concluded that each of these causes of action failed. The court also concluded that the cause of action for unfair competition against all defendants must be dismissed.

The Vanetiks' motion to compel an election of remedies by F&M Trust was denied. The Vanetiks and the Weed defendants separately objected to the proposed judgment on grounds of election of remedies. Those objections were overruled.

On April 15, 2016, judgment was entered based on the jury's verdicts and the court's ruling after the bench trial. The Vanetiks filed motions for JNOV and for a new trial. The trial court denied the Vanetiks' motions. Yuri and Tony each filed a notice of appeal from the judgment and the postjudgment order denying their motions for JNOV and for a new trial.

8

F&M Trust filed a motion for attorney fees against the Vanetiks. The trial court awarded F&M Trust $850,000 in attorney fees against the Vanetiks. The Vanetiks filed a notice of appeal from the attorney fees order.

The Weed defendants also filed motions for JNOV and for a new trial. The trial court granted the Weed defendants' motion for JNOV; the court did not rule on the new trial motion, declaring that the JNOV "essentially moots the Weeds' motion for a new trial." On July 8, 2016, the trial court entered a judgment that F&M Trust take nothing from the Weed defendants.

The Weed defendants then filed a motion to recover attorney fees. The court awarded the Weed defendants $325,000 in attorney fees against F&M Trust. F&M Trust filed a notice of appeal from the judgment in favor of the Weed defendants, and the award of attorney fees in favor of the Weed defendants. The Weed defendants filed a protective cross-appeal from the judgment, challenging the denial of their motion for a new trial in the event the appellate court reversed the trial court's order granting the JNOV.

DISCUSSION

I.

*THE FINDINGS IN THE JURY'S SPECIAL VERDICTS ARE NOT INCONSISTENT.*

Yuri and Tony argue that the jury's verdict on the claim for breach of the oral contract is inconsistent with its verdicts on the other claims the oral contract was purportedly intended to resolve. "'Inconsistent verdicts are "'against the law'"' and are grounds for a new trial. [Citations.] 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence. The rule finds parallel expression in the law relating to court findings: "Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error."' [Citations.] An inconsistent verdict may arise from an inconsistency

9

between or among answers within a special verdict [citation] or irreconcilable findings. [Citation.] Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law. [Citation.] The appellate court is not permitted to choose between inconsistent answers." (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682.)

The jury made the following findings regarding the claim for breach of the securities purchase agreement: (1) the Vanetiks entered into a written securities purchase agreement with F&M Trust; (2) all conditions required for the Vanetiks' performance occurred; (3) the Vanetiks breached the securities purchase agreement; and (4) F&M Trust was harmed by the Vanetiks' breach. Regarding the claim for breach of oral contract, the jury found: (1) the Vanetiks entered an oral contract to repay F&M Trust; (2) all conditions required for the Vanetiks to perform occurred; (3) the Vanetiks breached the oral contract; and (4) F&M Trust was harmed by the Vanetiks' breach. Regarding the fraud claims, the jury found: (1) the Vanetiks made a false representation to Broidy; (2) the Vanetiks knew the representation was false, or made the representation recklessly and without regard for its truth; (3) the Vanetiks intended that Broidy and F&M Trust rely on the representation; (4) Broidy and F&M Trust reasonably relied on the representation; and (5) their reliance on the representation was a substantial factor in causing harm to Broidy and F&M Trust.[2]

To summarize, the jury found that the Vanetiks defrauded Broidy before entering into the written securities purchase agreement; breached the securities purchase agreement; entered an oral contract in the hope of avoiding litigation; and then breached the oral contract as well. There is nothing inconsistent in the jury's findings.

A comparison with cases in which the verdicts were inconsistent supports our conclusion here. In *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.,*

_____

[2] The jury's findings regarding the claims for false promise and fraudulent concealment were similar.

10

*supra*, 126 Cal.App.4th 668, the jury's special verdict included two different findings about the value of the property in an eminent domain action. (*Id.* at pp. 682-683.) In *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 359, the appellate court concluded that the findings in the jury's special verdict that the defendants made no promises or misrepresentations to the plaintiff regarding his employment were "inconsistent with and cannot be reconciled with the jury's *other* findings" that the defendants fraudulently misrepresented and concealed important facts regarding the plaintiff's employment. In *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1182, a products liability case, the jury found there was no defect in the design of the Chevrolet Blazer, but then found General Motors was negligent in the design of the Chevrolet Blazer. The appellate court held that these findings were inconsistent because General Motors could not be deemed negligent if the design was not defective. (*Id.* at p. 1186.) In the present case, none of the jury's factual findings was inconsistent with any other factual finding.

## II.

### THE TRIAL COURT DID NOT ERR BY PERMITTING F&M TRUST TO ADD A CLAIM FOR BREACH OF ORAL CONTRACT AFTER THE PARTIES RESTED DURING THE FIRST PHASE OF THE TRIAL.

After the close of evidence, the trial court granted F&M Trust's oral motion to amend the complaint to add a cause of action against Yuri and Tony for breach of the oral contract made by Tony to buy back Broidy's Terra shares. "'Leave to amend a complaint is . . . entrusted to the sound discretion of the trial court. " . . . The exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse. *More importantly, the discretion to be exercised is that of the trial court, not that of the reviewing court*. Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record."'" (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.)

11

## A.

### *The Vanetiks Failed to Establish the Breach of Oral Contract Claim Was Barred by the Statute of Limitations.*

A cause of action for breach of an oral contract is subject to a two-year statute of limitations. (Code Civ. Proc., § 339, subd. 1.) The burden was on the Vanetiks to prove the statute of limitations had run on the claim for breach of an oral contract, unless facts proving the expiration of the statute appear on the face of the complaint. (*Wise v. Williams* (1887) 72 Cal. 544, 548.)

In this case, the claim for breach of oral contract was added by means of an oral motion, and there is no "face of the complaint" to review. The proposed second amended complaint for which F&M Trust sought leave to amend in September 2015 alleged that the breach of the oral contract occurred in November 2013: "In or around July, 2013, Mr. Broidy, as the beneficiary for Plaintiff, was told by Anatoly, Yuri, Weed and Yuri[] and Anatoly's counsel, Steve Brown, on numerous occasions that Terra, Anatoly and/or Yuri would pay back Plaintiff the entire amount of $750,000.00. This included oral representations between these parties that Yuri and Anatoly would personally guaranty such payment to Plaintiff. *The terms of the subject agreement were to be complied with no later than November, 2013*." (Italics added.) There was no testimony at trial regarding the date by which the oral contract to repurchase Broidy's Terra stock was to be completed. Camel e-mailed Weed on June 17, 2013 that "we need to have an executed Agreement by the end of this week." On July 25, 2013, Broidy e-mailed Tony: "Please instruct your attorney Rick Weed to complete and deliver the executed note and associated documents today. I require a $250k down payment by the 31st of July and the balance of $500k by Aug 15th."

The date by which the buy back was to occur was a moving target. The contract was not breached until the buy back was refused, or until an absolute end date passed without performance. Such a date does not appear in the record. The Vanetiks

12

therefore failed to prove the breach of oral contract occurred more than two years before the claim was added to the complaint in November 2015.[3]

B.

*F&M Trust Established the Existence of a Sufficiently Final and Definite Contract.*

The Vanetiks also argue that the trial court erred by permitting F&M Trust to amend the complaint because the alleged oral contract was not sufficiently final or definite to be enforced. An agreement to agree is not enforceable under California law. (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 213.)

However, a contract may be enforced when its general terms are agreed upon, although not all of the specifics of the contract have been settled. "'Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached.' [Citation.] 'To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.' [Citations.] 'Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.' [Citations.] 'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach

---

[3] The parties argue about whether the relation-back doctrine can save the breach of oral contract cause of action from being barred by the statute of limitations. "The relation-back doctrine requires that the amended complaint must (1) rest on the *same general set of facts*, (2) involve the *same injury*, and (3) refer to the *same instrumentality*, as the original one." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 408-409.) "An amended complaint relates back to an earlier complaint if the amended complaint is based on the same general set of facts, even if the plaintiff alleges a different legal theory or new cause of action." (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2016) 6 Cal.App.5th 1207, 1221-1222.) Our conclusion, *ante*, that the Vanetiks failed to prove the breach of oral contract cause of action was filed more than two years after that contract was breached obviates the need to address this argument.

13

and for giving an appropriate remedy.' [Citations.] But '[i]f . . . a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.'" (*Bustamante v. Intuit, Inc., supra,* 141 Cal.App.4th at p. 209.)

There is no real dispute about the terms of the oral contract. According to Broidy, he told Tony he was unhappy with the Terra investment, and Tony promised he would give Broidy his money back. The e-mails exchanged between Camel and Weed as the legal representatives of Broidy and Tony are consistent with this understanding.[4] The involvement of the legal representatives in documenting the agreement does not make it unenforceable for lack of certainty.

Nothing in the record supports the inference that Broidy and Tony did not intend their oral contract to be binding until a formal writing was executed. (See *Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1562.) The cases the Vanetiks cite in support of this argument are federal cases interpreting New York law, and are not helpful to our analysis. (See *Winston v. Mediafare Entertainment Corp.* (2d Cir. 1985) 777 F.2d 78; *R.G. Group, Inc. v. Horn & Hardart Co.* (2d Cir. 1984) 751 F.2d 69.)

Camel testified that he called Weed after communicating with Broidy, "and my recollection is that he was aware that our respective clients had reached a settlement of this transaction." Camel testified the settlement "was pretty straightforward. We would give back the stock and our rights, and my client would get his money back. And they would essentially just walk away from the transaction." Based on his conversation with Weed, Camel understood "that Mr. Weed understood that there was an agreement

---

[4] Tony denied there was an agreement to buy back Broidy's Terra stock, and Yuri testified Broidy mentioned he was "amenable" to selling back his shares, but that Yuri was not involved in any discussions about a deal.

14

between Mr. Broidy and the Vanetiks to repay the 750 to Mr. Broidy, and he would return the stock," and that "[t]here w[ere] no deal point issues."

C.

*The Admission of Evidence Regarding the Oral Contract Did Not Violate*
*Evidence Code Section 1152.*

The Vanetiks and the Weed defendants filed a motion in limine to "exclude evidence of settlement negotiations," specifically e-mails from Broidy and other evidence of settlement negotiations. Following a hearing, the trial court denied the motion in limine without prejudice.

As discussed more fully *ante*, Broidy testified that Tony promised to give back his money and that Yuri said, "I think my father will make it right"; Camel and Weed exchanged e-mails regarding a draft settlement agreement; and Broidy e-mailed Tony regarding Tony's "repeated assurances that you will buy out my Terra shares at cost of $750,000."

Generally, statements made in an attempt to compromise a dispute are inadmissible at the trial of the dispute. (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 35-36.) The trial court's decision to admit evidence over an objection based on Evidence Code section 1152[5] is reviewed on appeal for abuse of discretion. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 296.)

---

[5] As is relevant here, Evidence Code section 1152 provides: "(a) Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it. [¶] . . . [¶] (c) This section does not affect the admissibility of evidence of any of the following: [¶] . . . [¶] (2) A debtor's payment or promise to pay all or a part of his or her preexisting debt when such evidence is offered to prove the creation of a new duty on his or her part or a revival of his or her preexisting duty." (*Id.*, subds. (a), (c)(2).)

15

Evidence relating to the negotiations between Broidy and Tony to resolve the claims for breach of the securities purchase agreement and for fraud was offered not to prove those claims, but to establish the separate claim for breach of oral contract. "Accepting defendants' evidence that Nicholas and Paul were negotiating a compromise of a wrongful termination claim asserted by Hawran, the statements of Hawran and Nicholas at issue were admitted not to demonstrate defendants' liability for wrongful termination, but to establish a binding agreement had been reached regarding the terms of Hawran's resignation for purposes of a different, subsequent, breach of contract claim. Evidence Code section 1152 only prohibits 'the introduction into evidence of an offer to compromise a claim for the purpose of proving liability for *that claim*.'" (*Hawran v. Hixson, supra*, 209 Cal.App.4th at pp. 296-297.)

III.

*THE TRIAL COURT'S FAILURE TO FORCE AN ELECTION OF REMEDIES BY F&M TRUST DID NOT PREJUDICE THE VANETIKS.*

The Vanetiks argue that the trial court erred by entering judgment both on F&M Trust's claim for breach of the written securities purchase agreement and its fraud-based claims.

A leading treatise describes the rule and rationale for the election of remedies doctrine as follows: "Under traditional doctrine . . . a plaintiff who has two 'inconsistent' remedies must 'elect' between them and pursue only one of them. . . . Remedies are traditionally found to be 'inconsistent' when one of the remedies results from 'affirming' a transaction and the other results from 'disaffirming' a transaction. Most typically the plaintiff has elected, or is forced to elect, between rescission and damages remedies, but the election rule may apply to any pair of affirming or disaffirming remedies . . . ." (2 Dobbs, Law of Remedies (2d ed. 1993) § 9.4, pp. 603-604.)

16

In this case, F&M Trust did not seek relief based on a disaffirmance of the securities purchase agreement. The cause of action for breach of written contract sought damages for the breach of the securities purchase agreement—damages which resulted from the affirmance of the contract. The causes of action for fraud sought damages due to F&M Trust's investment in Terra becoming valueless—damages which also resulted from the affirmance of the contract. Therefore, the breach of contract and fraud claims did not present an issue of seeking relief based on theories that both affirmed and disaffirmed the contract. The election of remedies doctrine was never implicated, and the trial court did not err in denying the requests to force F&M Trust to make an election of remedies.

"The doctrine of election of remedies, often invoked in the earlier cases, has been repeatedly criticized and seems to be falling into disfavor. Later California decisions illustrating binding election are comparatively rare, and the bar to a remedy is sustained on the principles of estoppel or res judicata rather than election. 'At best this doctrine . . . is a harsh, and now largely obsolete rule, the scope of which should not be extended.' [Citations.] [¶] Modern writers have contended that the only sound explanation for a doctrine of election of 'remedies' is that, in some situations, there may be a required choice of substantive rights. Thus, no person would be entitled to claim two inconsistent rights [citation], but a person would be free to select and change his or her alternative remedies or legal theories of recovery, by amending the complaint or by filing a new action, until such time as one of the inconsistent rights was finally vindicated by the satisfaction of a judgment or by the application of the doctrine of res judicata or estoppel." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 180, pp. 260-261.)

In this case, the jury was asked to make a single determination of the damages to be awarded to F&M Trust if they found liability under any or all causes of action. The jury awarded $750,000 in damages. Even if there was some theoretical difference between the damages resulting from breach of the securities purchase

17

agreement and the damages resulting from fraud, the Vanetiks fail to show how they were prejudiced by the judgment.

*THE JURY'S VERDICT THAT THE VANETIKS WERE LIABLE FOR BREACHING THE SECURITIES PURCHASE AGREEMENT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE.*

Tony argues that F&M Trust failed to introduce any evidence supporting holding him liable for breaching the securities purchase agreement. We review the jury's factual findings for substantial evidence. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489.)

It is undisputed that Tony did not sign the securities purchase agreement. The securities purchase agreement was signed by Miller on behalf of seller KLEL, and by Broidy on behalf of buyer F&M Trust. It is further undisputed that Tony was not an officer or director of KLEL. Broidy testified that the purchase of stock from "KLEL was just an accommodation." Broidy further testified: "I was told that the Vanetiks controlled KLEL, and that Dean Miller was operating as the managing member at their request." Broidy had been told Miller was a longtime friend and business associate of the Vanetiks.

In denying the Vanetiks' motions for JNOV and for a new trial, the trial court found: "Nor does their contention that they should not be personally liable for this claim do any more than fill some of their available fifteen pages. They were the artful puppeteers who masterminded the scam that relieved the plaintiff of $750,000. That money was used to personally enrich these defendants and enable them to travel the world trolling for more big fish. Not a spoonful of dirt was turned in any Russian oil field. As near as the court can recall, there was no testimony that either of these defendants ever even visited the oil fields with any of the plaintiff's money in their pockets. The jury surely had little trouble concluding that the Vanetiks should be personally liable for the misdeeds committed behind the screen of some corporate name."

18

In this case, the jury was correctly instructed regarding the Vanetiks' liability under theories of partnership and joint venture. Under either of those theories, the jury could have found the Vanetiks were parties to the securities purchase agreement. (*Deicher v. Corkery* (1962) 205 Cal.App.2d 654, 662 [each partner or joint venturer is the agent of the others in entering contracts benefitting the partnership or joint venture].) The jury was not asked in the special verdict whether it had found one or both of those theories to be true.

V.

*THERE WAS SUBSTANTIAL EVIDENCE OF F&M TRUST'S DAMAGES ON THE FRAUD-BASED CLAIMS.*

The Vanetiks argue that F&M Trust failed to prove damages on the fraud causes of action. We review the jury's factual findings regarding the amount of compensatory damages for substantial evidence. (*Piedra v. Dugan, supra,* 123 Cal.App.4th at p. 1489.)

One who is defrauded in connection with the purchase or sale of property may "recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction." (Civ. Code, § 3343, subd. (a).)

The Vanetiks rely primarily on *Zinn v. Ex-Cell-O Corp.* (1944) 24 Cal.2d 290, in which the California Supreme Court held that under Civil Code section 3343, the value of stock is "determined by the worth of the corporate assets, not the 'market value' of the stock." (*Zinn v. Ex-Cell-O Corp., supra*, at p. 297.) The American Law Reports, on which *Zinn* relies, does not apply to fraud actions similar to the one in this case. "[T]he measure of damages recoverable for misrepresentations affecting the value of corporate securities which one is induced to purchase in reliance upon the representations made is the difference between the true and actual value of the stocks or bonds purchased (usually determined as of the time of the purchase) and their

19

value had the facts been as represented—the difference between the value thereof in the actual financial condition of the corporation at the time, and its value had the corporation been in the condition represented." (Annot., Measure of Damages for Fraud Inducing the Purchase of Corporate Securities (1928) 57 A.L.R. 1142, 1143.) The Vanetiks did not misrepresent to Broidy the value of the stock F&M Trust was purchasing. Rather, the Vanetiks misrepresented how they would use the money being invested, claiming it would be used to uncap oil wells, when in fact they intended to use it to pay off existing debts. (See *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 145 [Civ. Code, § 3343 "must be applied realistically so as to give the defrauded person his actual out-of-pocket loss and where necessary to reach that result, courts must consider subsequent circumstances"].)

VI.

*THE PUNITIVE DAMAGES AWARDS AGAINST YURI AND TONY WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.[6]*

The jury awarded F&M Trust $1.25 million in punitive damages against Tony, and $2 million against Yuri. Yuri and Tony argue that the punitive damages awards must be reversed because F&M Trust failed to offer sufficient evidence of their respective financial conditions. We agree.[7]

---

[6] After oral argument, we asked F&M Trust, Yuri, and Tony to brief nine questions relating to the law and the evidentiary record on the issue of punitive damages. Each of these parties filed two extensive supplemental briefs. We have considered all the arguments made in those briefs.

[7] On appeal, Yuri and Tony argue both that (1) F&M Trust failed to present sufficient evidence of their respective financial conditions, and (2) the punitive damages awards against them were excessive as a matter of law in light of their financial conditions and their alleged wrongdoing. Because we reverse the punitive damages awards against both Yuri and Tony based on the first argument, we need not reach the second.

20

## A.

### *Applicable Law*

"Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages. [Citation.] We examine the record to determine whether the challenged award rests upon substantial evidence. [Citations.] If it does not, and if the plaintiffs had a full and fair opportunity to make the requisite showing, the proper remedy is to reverse the award." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 195.)

"'The California Supreme Court has declined to prescribe any particular standard for assessing a defendant's ability to pay punitive damages [citation], but it has held that actual *evidence* of the defendant's financial condition is essential.'" (*Morgan v. Davidson* (2018) 29 Cal.App.5th 540, 551.) "A reviewing court cannot make a fully informed determination of whether an award of punitive damages is excessive unless the record contains evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*).) The plaintiff has the burden to establish a defendant's financial condition. (*Id.* at p. 120; *Morgan v. Davidson, supra*, 29 Cal.App.5th at p. 551.)

While "there is no rigid formula and other factors may be dispositive especially when net worth is manipulated and fails to reflect actual wealth," net worth is often described as "the critical determinant of financial condition." (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 546.)

A plaintiff seeking punitive damages must provide a balanced overview of the defendant's financial condition; a selective presentation of financial condition evidence will not survive scrutiny. (See *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 676; *id.* at p. 681 [record "silent with respect to . . . liabilities" is insufficient]; *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916-917 [no evidence (1) the defendant still owned the property, (2) of what encumbrances were on the property, and (3) of the value of the

21

property]; *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1151-1153 [evidence only of the defendant's income or the profits the defendant wrongfully gained is not meaningful evidence that can support an award of punitive damages]; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1063-1065 [evidence of income only is insufficient].)  We may not infer sufficient wealth to pay a punitive damages award from a narrow set of data points, such as ownership of valuable assets or a substantial annual income.

B.

*Evidence of Financial Condition of the Vanetiks*

F&M Trust's expert witness testified as to his methods for determining an individual's net worth:  "It's just simply the . . . fair value of the individual's assets that they own or have control over or rights to . . . less the fair value of the debts or obligations that they have.  That difference, that net amount is considered an entity's or an individual's net worth.  [¶] In addition, you also have to look at an individual's cash flow or sources of income.  For example, an individual may not own any assets because perhaps they are renting everything that they are using, but they may be generating a lot of cash flow that would enable them also to pay a judgment."

F&M Trust's expert witness testified that Yuri had a net worth of $411,000, and an annual income of $5,925,000.[8]  The expert also testified that Tony had a net worth

---

[8]  The basis of this opinion was that Yuri was manager of four corporations.  Terra paid him $30,000 annually in compensation for serving on its board of directors.  Yuri also served on the board of directors for several other for profit companies; one of these business had annual revenues in excess of $500 million.  Terra claimed to own oil reserves worth $11 billion.

Yuri also managed a real estate company that flipped 40 to 50 properties annually.  He was the owner and sole employee of Vanetik International, which had revenues of $900,000 per year.

Yuri owned multiple expensive cars.  Yuri claimed he had sold the bulk of his extensive wine collection (which included bottles worth $20,000); he maintained wine in lockers in various restaurants.  He also bought, sold, and traded high-end watches, and he currently

22

of $1,440,400, and no annual income.[9]  Although the expert purported to consider Yuri's and Tony's respective net worths, in actuality he considered only their assets, without any consideration of liabilities (on those assets or otherwise).  As to Yuri's income, the expert testified Yuri had an annual income of $5,000,000 from Vanetik International.  The expert obtained that figure from checking and savings account applications submitted by the company to Wells Fargo in 2007 and in 2012, which claimed the company's gross sales were $5,000,000.  In addition to the remoteness in time of these applications, their use of gross sales and their lack of any supporting documentation makes them virtually useless for determining Yuri's financial condition at the time of the trial.  The expert also testified that Yuri had an annual income of $925,000 from a company called Dominion Partners.  That figure was based on Dominion Partners' profits from 2008 through 2010.  Nothing in the appellate record supports that figure.

The expert valued Tony's home at $900,000, based on the halfway point between the value on the Zillow Website and the assessed property tax value.  The expert admitted that he did not know who actually owned the home, or whether there were any

owned three such watches with an average value of $30,000 to $40,000; one watch had been acquired shortly after Broidy invested $750,000 in Terra, at a price of $57,000.  Yuri, on average, charged $48,200 per month on an American Express black card.  He had a social membership at the Shady Hills Golf Club.

[9]  The basis of this opinion was that Tony was the chairman of the board of Turan Petroleum, owned Vanetik Engineering Consultants, was a partner in Darby Holdings, owned an interest in Archer Resources, and was a manager and 20 percent owner of Presidio Partners; Presidio owned 325 acres of oceanfront property in Hawaii which was scheduled for residential development.  F&M Trust's expert witness testified that Tony's interest in the Hawaiian property was worth $500,000. Tony owned a Mercedes, a Mazda, and a Porsche, and drove a Bentley on which Archer Industries was paying $1,600 per month.  Tony's house, sculptures, jewelry, and diamonds were all held in his wife's name.  The sculptures included six or seven sculptures by Richard MacDonald that were purchased for $3,000 to $10,000 each.  Tony's personal charges on the American Express black card averaged $13,540 per month.

23

liens against it. The expert also valued Tony's interest in a piece of real property in Hawaii at $500,000, based on a real estate appraisal that was not admitted in evidence.

Finally, the expert offered circumstantial evidence of Yuri's and Tony's incomes based on their monthly American Express statements. Yuri's expenditures were $48,200 per month in 2011; Tony's American Express expenditures were $13,540 per month at that time. Because those figures were from 2011, four years before trial, they were not relevant to a determination of Yuri's and Tony's current financial conditions.

In short, there was insufficient admissible evidence of Yuri's and Tony's current financial conditions to support the award of punitive damages. F&M Trust had a full and fair opportunity to make the requisite showing and failed to do so. Accordingly, we will reverse the awards of punitive damages. There shall be no new trial. (*McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661.)

## C.

### *Estoppel Theory*

F&M Trust argues that Yuri and Tony should be estopped from complaining about the absence of evidence regarding their financial condition because they failed to timely produce evidence of their finances. "[I]f a plaintiff is unable to provide the court with evidence due to the defendant's failure to comply with discovery obligations, then punitive damages may be awarded without the requisite evidence." (*Morgan v. Davidson, supra,* 29 Cal.App.5th at p. 551.) Because the burden was on F&M Trust to present evidence of Yuri's and Tony's financial conditions (*Adams, supra*, 54 Cal.3d at pp. 119-123), it was also incumbent on F&M Trust to show why that burden should be excused. In the absence of such a showing, we are compelled to conclude that the award of punitive damages cannot stand.

Initially, we note that F&M Trust did not raise the issue of estopping Yuri and Tony from challenging the sufficiency of the evidence of their financial conditions until F&M Trust filed its opposition to the Vanetiks' JNOV motion.

24

F&M Trust did not file a motion for pretrial discovery of a defendant's financial condition pursuant to Code of Civil Procedure section 3295, subdivision (c) with respect to Yuri or Tony. F&M Trust argues that it sought such evidence through other means of pretrial discovery, which the Vanetiks "vociferously" fought. F&M Trust therefore argues Yuri and Tony should be estopped from arguing F&M Trust did not provide sufficient evidence of their financial conditions. F&M Trust's argument flies in the face of Code of Civil Procedure section 3295, subdivision (c), which precludes such pretrial discovery in the absence of a valid court order. "Section 3295 was enacted . . . to protect defendants from the premature disclosure of their financial condition when punitive damages are sought." (*Medo v. Superior Court* (1988) 205 Cal.App.3d 64, 67.)

In *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, the appellate court held that a trial court may permit the discovery of a defendant's financial condition after liability has been determined, even if the plaintiff did not file a motion for pretrial discovery of financial condition. (*Id.* at p. 609.) After the trial court ruled in favor of the plaintiff in a bench trial, it ordered the defendant to bring records regarding his net worth to the court the next day. (*Id.* at p. 603.) The defendant failed to do so, and the trial court awarded punitive damages to the plaintiff using a multiplier of the compensatory damages. (*Id.* at p. 604.) "So long as the trial court allows the defendant sufficient time, following a determination of liability, to collect his or her financial records for presentation on the issue of the amount of such damages to be awarded, there is nothing prejudicial or unfair about using such a process to try the issue of the amount of punitive damages." (*Id.* at p. 609.)

In this case, the trial court did not order Yuri or Tony to produce documents or other evidence of their financial condition, but rather to make their "best efforts" to

provide the requested information before the punitive damages portion of the trial began.[10]

Morgan v. Davidson, supra, 29 Cal.App.5th 540, cited by F&M Trust, is distinguishable. In that case, the plaintiff served written notice on the defendant's attorney for attendance at a court hearing under Code of Civil Procedure section 1987, subdivision (b), to obtain evidence relating to the defendant's financial condition. (Morgan v. Davidson, supra, 29 Cal.App.5th at p. 551.) Because the defendant failed to appear at the hearing, and therefore failed to comply with his discovery obligations, the plaintiff was excused from providing evidence of the defendant's financial condition. (Id. at p. 552.) But in the present case, F&M Trust's failure to timely serve any type of punitive damages discovery on Yuri or Tony means that this estoppel theory is inapplicable and F&M Trust was not relieved of its burden of offering admissible evidence of Yuri's and Tony's financial conditions.

F&M Trust's failure to offer substantial evidence of Yuri's and Tony's current financial conditions, therefore, cannot be excused by the Vanetiks' alleged failure to provide evidence of their respective financial worth.

Finally, we wish to make clear that we are not holding that F&M Trust's decision to not seek discovery under Code of Civil Procedure section 3295 would have barred it from recovery of punitive damages. We do conclude that F&M Trust did not offer admissible evidence supporting a punitive damages award and there is no legal excuse that relieves them from that burden.

---

[10] The hearing at which this "order" was made was not on the record, and there is no transcript of what was said. The parties, however, do not dispute this was the substance of what Yuri and Tony were ordered to do in terms of their financial information.

26

## VII.

*AWARD OF ATTORNEY FEES AGAINST THE VANETIKS*

The trial court found that F&M Trust was the prevailing party in the litigation and awarded it attorney fees. The securities purchase agreement contains a prevailing party attorney fees clause.

Both Tony and Yuri argue that the awards of attorney fees against them must be reversed because F&M Trust failed to prove that either Tony or Yuri breached the securities purchase agreement. If a judgment is reversed, the attorney fee award must also be reversed. (*Friends of the Hastain Trail v. Coldwater Development LLC* (2016) 1 Cal.App.5th 1013, 1037.) Neither Tony nor Yuri addresses any specific portion of the attorney fees award.

Because we affirm the breach of written contract claim against the Vanetiks, we also affirm the trial court's award of attorney fees against them. The reversal of the punitive damages award does not affect the attorney fees analysis, and neither Yuri nor Tony argues that it does.

## VIII.

*THE TRIAL COURT PROPERLY GRANTED THE WEED DEFENDANTS' MOTION FOR JNOV BASED ON THE LACK OF EVIDENCE OF A CONSPIRACY BETWEEN THE WEED DEFENDANTS AND THE VANETIKS.*[11]

The trial court granted the Weed defendants' motion for JNOV based on Civil Code section 1714.10. "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v.*

---

[11] In its opening brief, F&M Trust argued that the Weed defendants' motion was not filed in compliance with the Code of Civil Procedure. The Weed defendants countered that the their papers had been properly filed and served, pursuant to Code of Civil Procedure section 629, and that F&M Trust was citing to outdated statutes and treatises. F&M Trust's failure to respond to this argument in its reply brief indicates its concession that the JNOV motion was properly filed and served.

27

*Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) On appeal, "we apply the substantial evidence test to the jury verdict, ignoring the judgment." (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 546, overruled on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548.)

There was no evidence at trial that the Weed defendants made any fraudulent misrepresentations to Broidy. Therefore, the Weed defendants' liability depended on F&M Trust establishing that the Vanetiks and the Weed defendants were members of a conspiracy. The jury's verdict shows it found the existence of such a conspiracy. In granting the Weed defendants' JNOV motion, the trial court concluded that a conspiracy involving the Weed defendants could not be established by operation of Civil Code section 1714.10. The court's minute order granting the JNOV reads in relevant part as follows:

"A principal contention of the Weeds is that defendant Richard Weed acted throughout this extended transaction solely in his capacity as attorney for the Vanetiks and that there was no basis for making him personally liable for the Vanetiks' misdeeds. It is easy to understand why the jury would fault lawyer Weed for this fraud. The simple fact that he was counsel for the Vanetiks made it easy to find guilt by association. Weed submitted a very opaque bill to the Vanetiks for his services and thereby apparently got $50,000 of the funds that the Vanetiks extracted from the plaintiff. Because Weed was the escrow holder in this transaction, the plaintiffs' money passed through his hands in transit to the Vanetiks' pockets.

"Attorney Weed's principal attack upon this verdict is based upon the terms of Civil Code section 1714.10, which limits the liability of an attorney to a third party for actions taken in the course of his/her representation of a client. In the present case, Weed was counsel for the Vanetiks. The plaintiff does not contend that Weed ever represented either the plaintiff bank or its depositor Broidy. In fact, the plaintiff had its own counsel (David Camel) who negotiated with Weed in an adversarial position while documenting

28

the oil investment. However, that does not necessarily exculpate Weed. Section 1714.10(c) deprives an attorney of any potential shield of this statute 'where (1) the attorney has an independent duty to the plaintiff or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain.' The court has concluded that, in this transaction, Weed came within the protective scope of section 1714.10 and that his work did not expose him to liability to Broidy or the plaintiff. These points may be pertinent:

"— The Vanetiks and the plaintiff each had their own attorney. Nothing here could have led the plaintiff to believe that Weed represented it or Broidy. Weed owed no independent legal duty to the plaintiff or to Broidy.

"— There was minimal actual contact between Weed and Broidy. Anything Weed then did or said could only reasonably be understood as actions taken on behalf of the Vanetiks.

"— The $50,000 fee the Vanetiks paid to Weed was for the latter's professional services. As such, it is not evidence of action 'beyond the performance of a professional duty . . . in furtherance of the attorney's financial gain.' There is no question that Weed performed professional services for the Vanetiks, for which he was entitled to be paid. The skimpy nature of his billing may have aroused the plaintiff's suspicions, but this is not evidence of actionable misdeeds by Weed. Remember that the Vanetiks could document virtually none of their dubious expenditures; if they thought that Weed's bill was adequate, this is a matter between lawyer and client and not proof of fraud.

"— The court has previously ruled that Weed's actions as escrow holder in this doomed stock sale did not violate any of the terms of the parties' escrow agreement. He obeyed the instructions that were given him by the parties to the escrow. The plaintiff could point to no contractual term that he breached.

29

"The sanctity of the professional relationship between lawyer and client has led the [L]egislature to promulgate section 1714.10. The present claim is barred by that statute. The Weeds' motion for judgment notwithstanding the verdict is therefore granted. One day, even the attorneys representing this plaintiff may invoke this code section when a zealous adversary challenges their representation of a client who is alleged—or even proven—to be a scoundrel."

Civil Code section 1714.10 provides, in relevant part, as follows: "(a) No cause of action against an attorney for a civil conspiracy with his or her client arising from any attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client, shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. . . .

"(b) Failure to obtain a court order where required by subdivision (a) shall be a defense to any action for civil conspiracy filed in violation thereof. The defense shall be raised by the attorney charged with civil conspiracy upon that attorney's first appearance by demurrer, motion to strike, or such other motion or application as may be appropriate. Failure to timely raise the defense shall constitute a waiver thereof.

"(c) This section shall not apply to a cause of action against an attorney for a civil conspiracy with his or her client, where (1) the attorney has an independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain." (*Id.*, subds. (a)-(c).)

Civil Code section 1714.10 is inapplicable in this case for two reasons. First, F&M Trust did not assert a cause of action against the Weed defendants "arising from any attempt to contest or compromise a claim or dispute." (Civ. Code, § 1714.10,

subd. (a).)  Second, the Weed defendants raised the provisions of Civil Code section 1714.10 for the first time in their motion for JNOV.  The express language of section 1714.10, subdivision (b) requires that the defense be raised in the attorney's "first appearance" in the case.  The Weed defendants' failure to do so waived their right to assert the defense under that statute.  (*Villa Pacific Building Co. v. Superior Court* (1991) 233 Cal.App.3d 8, 12; see *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1535 [applying *Villa Pacific's* analysis to Code Civ. Proc. § 425.13].)

Nevertheless, the exceptions set forth in Civil Code section 1714.10, subdivision (c) are consistent with common law.  "An attorney may be held liable for conspiring with his or her client to commit actual fraud or for the intentional infliction of emotional distress.  [Citations.]  But plaintiffs can state a viable claim only if the attorneys' actions went beyond their role as attorneys acting on behalf of [their clients]."  (*Panoutsopoulos v. Chambliss* (2007) 157 Cal.App.4th 297, 306.)

"To be sure, an attorney, acting in the scope of his or her official duties, and not for individual gain, can be liable to third parties in certain circumstances.  But those circumstances will always require that the attorney have a duty to the third party.  For example, if an attorney commits actual fraud in his dealings with third parties, the fact that he did so in the capacity of attorney does not relieve him of liability.  [Citations.]  Similarly, where an 'attorney gives his client a written opinion with the intention that it be transmitted to and relied upon by the plaintiff in dealing with the client[,] . . . the attorney owes the plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it is "the end aim of the transaction."'"  (*Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 395.)

F&M Trust argues that the Weed defendants owed it an independent legal duty because Weed was the escrow agent for the securities purchase agreement.  An escrow agent is a "fiduciary of the parties to the escrow."  (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711.)  F&M Trust fails to

31

explain how Weed's role as the escrow agent could create a legal duty in connection with a separate contract to which the Weed defendants were not parties. F&M Trust also fails to address the trial court's contrary ruling after the bench trial in favor of the Weed defendants and against F&M Trust on the causes of action for breach of fiduciary duty and breach of the escrow agreement.

The trial court correctly concluded there was insufficient evidence of (1) the existence of a conspiracy between the Weed defendants and the Vanetiks, (2) an independent duty to F&M Trust on the part of the Weed defendants, or (3) that the Weed defendants' acts went beyond the performance of a professional duty to serve their clients.

IX.

*BECAUSE THE TRIAL COURT PROPERLY GRANTED THE JNOV IN FAVOR OF THE WEED DEFENDANTS, THE PUNITIVE DAMAGES AWARD AGAINST THEM WAS NECESSARILY REVERSED. IN ANY EVENT, THE TRIAL COURT WOULD HAVE CORRECTLY REVERSED THE PUNITIVE DAMAGES AWARDS AGAINST THE WEED DEFENDANTS.*

The trial court's ruling on the JNOV motion resolved all remaining claims against the Weed defendants; the punitive damages awards against the Weed defendants were necessarily vacated as well. Even if the JNOV had not been granted in favor of the Weed defendants, insufficient evidence supported the jury's award of punitive damages against them.

The trial court included an analysis of these punitive damage awards: "It is not now necessary to address a secondary issue raised by the Weeds. But the court will nevertheless express its view on the award of punitive damages against the Weeds. Succinctly, there was inadequate evidence to support any such award. The burden rests upon a claimant to present evidence of the amount that would be a fair and just award of such damages. No one can confidently claim to know exactly where the line is drawn between sufficient and insufficient competent evidence of the defendant's ability to pay such damages. In regard to the Vanetiks, the court has already determined that the many

32

bits of information cobbled together by the plaintiff presented an adequate picture of their net worth. Here, the plaintiff fell well short of that dividing line. The failure to get any pretrial discovery of relevant information or to present such in either the first or second phase of this trial required the plaintiff's expert witness to hazard unsupported guesses about critical facts. This failure of proof undermined the award and would require that it be vacated."

F&M Trust's expert testified that Weed lived in a house worth about $1.997 million, and earned $223,000 from his law practice in 2014. The expert conceded he did not know whether Weed owned the house, whether there were any encumbrances on the house, or whether the value as stated on Zillow was accurate. The expert testified that Weed & Company, LLP and Weed & Company, L.C. had no value; counsel conceded during closing argument in the second phase of the trial that the law firms had "no net worth."

In *Lara v. Cadag, supra,* 13 Cal.App.4th at page 1064, the court held that evidence of the defendant's income, without more, was "wholly inadequate" to support an award of punitive damages against the defendant. Absent any admissible evidence that the house in which Weed lived was actually his property or that it had a net positive value, the only evidence supporting the punitive damages award was the evidence of Weed's annual income. This is legally insufficient.

F&M Trust argues on appeal that net worth need not be proven, and that "evidence of the profit of ill gotten gains can be enough," citing *Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1299-1300. The problem with this argument is that F&M Trust fails to cite to anything in the appellate record showing "ill gotten gains" by the Weed defendants.

F&M Trust also argues that the Weed defendants presented no evidence regarding encumbrances against the property. A plaintiff bears the burden of proving its claim for punitive damages. (*Adams v. Murakami, supra,* 54 Cal.3d at p. 119.) F&M

33

Trust failed to do so here, and the Weed defendants had no obligation to counter its evidentiary offerings. (Evid. Code, § 500; *Mathis v. Morrissey* (1992) 11 Cal.App.4th 332, 346; *Vaughn v. Coccimiglio* (1966) 241 Cal.App.2d 676, 678.)

X.

*THE TRIAL COURT DID NOT ERR IN NONSUITING THE BREACH OF CONTRACT CLAIM AGAINST THE WEED DEFENDANTS.*

At the conclusion of the jury trial, the Weed defendants orally moved for nonsuit on the breach of written contract claim against them. The Weed defendants argued that they were not parties to the securities purchase agreement, and therefore could not be held liable for any breach of that agreement. The trial court granted the nonsuit motion.

"We review a grant of nonsuit de novo, applying the same standard governing the trial court. [Citation.] As the Supreme Court has explained, 'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded."' [Citation.] Consequently, the reviewing court 'will not sustain the judgment "'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.'"'" (*Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1544-1545.)

In its opening brief on appeal, F&M Trust argued that the Weed defendants and the Vanetiks were members of a joint venture, and that the securities purchase agreement was a contract reasonably necessary to carry out their enterprise. Missing from F&M Trust's argument is a citation to any evidence in the appellate record relevant

34

to whether a joint venture involving the Weed defendants was ever formed. In the absence of such evidence, the trial court correctly granted the nonsuit motion.

## XI.

### *THE WEED DEFENDANTS' APPEAL FROM THE JUDGMENT.*

The trial court denied the Weed defendants' motion for a new trial by operation of law when it failed to rule on the motion after having granted the JNOV motion. (Code Civ. Proc., § 660, former subd. (c); see generally *In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 149.) The Weed defendants filed a protective appeal from the judgment. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 240 [order denying motion for new trial is nonappealable and must be reviewed on appeal of underlying judgment].)

Because we have affirmed the trial court's order granting the JNOV motion, we dismiss as moot the Weed defendants' appeal from the judgment.

## XII.

### *AWARD OF ATTORNEY FEES AGAINST F&M TRUST AND IN FAVOR OF THE WEED DEFENDANTS.*

After the trial court entered judgment in their favor, the Weed defendants filed a motion for attorney fees. The Weed defendants argued that the securities purchase agreement and the escrow agreement, both of which they were alleged to have breached, contained provisions authorizing the recovery of attorney fees by a prevailing party in litigation involving the agreements. The trial court granted the Weed defendants' motion.

F&M Trust argues that the award of attorney fees against it and in favor of the Weed defendants must be reversed if this court reverses the judgment in favor of the Weed defendants. (*Friends of Hastain Trail v. Coldwater Development LLC* (2016) 1 Cal.App.5th 1013, 1037 [reversal of judgment requires reversal of attorney fee award].) F&M Trust does not otherwise challenge the Weed defendants' entitlement to attorney fees, nor does it challenge any specific portion of the attorney fees award.

35

Because we have affirmed the trial court's order granting the JNOV motion, we also affirm the court's award of attorney fees against F&M Trust.

DISPOSITION

The awards of punitive damages against Yuri Vanetik and Anatoly Vanetik are reversed and there shall be no new trial. In all other respects, the April 15, 2016, judgment in favor of F&M Trust and against Yuri Vanetik and Anatoly Vanetik is affirmed. Because all parties prevailed in part in appeal Nos. G053688 and G053689, in the interests of justice no party shall recover costs on those appeals.

The August 29, 2016, postjudgment order awarding attorney fees to F&M Trust and against Yuri Vanetik and Anatoly Vanetik is affirmed. F&M Trust to recover costs in appeal No. G054218.

The July 8, 2016, judgment in favor of the Weed defendants and against F&M Trust is affirmed. The August 29, 2016, postjudgment order awarding attorney fees to the Weed defendants and against F&M Trust is affirmed. The Weed defendants to recover their costs on appeal. The Weed defendants' cross-appeal in appeal No. G053978 is dismissed as moot.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.


36

Filed 3/27/19

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FARMERS & MERCHANTS TRUST COMPANY, as Trustee, etc.,<br><br>Plaintiff and Respondent,<br><br>    v.<br><br>YURI VANETIK et al.,<br><br>Defendants and Appellants. | G053688 (consol. with G053689, G054218)<br><br>(Super. Ct. No. 30-2013-00688150)<br><br>ORDER MODIFYING OPINION AND GRANTING REQUEST FOR PARTIAL PUBLICATION; NO CHANGE IN JUDGMENT |
| FARMERS & MERCHANTS TRUST COMPANY, as Trustee, etc.,<br><br>Plaintiff and Appellant,<br><br>    v.<br><br>RICHARD WEED et al.,<br><br>Defendants and Appellants. | G053978<br><br>(Super. Ct. No. 30-2013-00688150) |

Defendants and Appellants Richard Weed, Weed & Co., L.C., and Weed & Co. LLP and their appellate counsel, White & Reed and Michael R. White, have requested that our opinion, filed on February 27, 2019, be certified for partial publication. It appears that portions of our opinion meet the standards set forth in California Rules of

Court, rule 8.1105(c)(2)-(4).  The request for partial publication is GRANTED pursuant to California Rules of Court, rule 8.1110.

This opinion is ordered published in the Official Reports with the exception of parts I, II, III, IV., V., VII., X., XI., and XII. of the Discussion, and their subparts.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.