Filed 2/14/25  Beck v. Namini CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| CYNTHIA BECK,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CYRUS NAMINI et al.,<br><br>        Defendants and Appellants. | B331200<br><br>(Los Angeles County Super. Ct. No. 18STCV02713) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge.  Affirmed as modified.

James Alex Karagianides for Defendants and Appellants.

Keiter Appellate Law and Mitchell Keiter for Plaintiff and Respondent.

# INTRODUCTION

Cyrus Namini appeals from the judgment after the trial court found him and his company, Franklin & Sons (collectively, Namini), liable for damaging Cynthia Beck's classic 1972 Porsche and awarded Beck $50,000 for loss of use, $70,000 for cost of repairs, and $250,000 in punitive damages. Namini argues that substantial evidence did not support the trial court's findings Namini wrongfully possessed and damaged the Porsche and that the trial court made various errors in calculating damages. We conclude that substantial evidence supported the court's findings, but that Beck was entitled to damages only for the Porsche's diminution in market value and only in the amount of $32,000. Therefore, we modify the judgment and affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

### A. *Beck's Stolen Porsche Arrives in Namini's Storage Unit*

In 1974 Beck bought a 1972 Porsche 911S Targa, one of only 900 of that model imported for sale in the United States. In 1988 Beck stopped driving the car and registered it with the Department of Motor Vehicles (DMV) as non-operational. In March 2016 burglars stole the Porsche and a safe containing the car's certificate of title (the "pink slip") from Beck's home. Beck and her partner, Gerry Saenz, reported the burglary to the police.

Namini owned a residential building with extra garages, which he leased as storage units. In September 2016 an "American white guy, very well dressed" (according to Namini) responded to Namini's advertisement for a garage unit to rent.

The man, whose name Namini did not remember, said he wanted to store a classic car and paid $250 in cash for the first month's rent. The man began to fill out a rental application, but said he had to leave to attend an important meeting and would return later to complete the application. Namini put the partially completed application in a folder, but later could not find it. Namini did not see the renter move the Porsche into the garage, but a few days later Namini noticed a car in the garage and a padlock on the garage door.

In October 2016 the unidentified renter sent Namini a text message stating he had placed the second month's rent in a mailbox at Namini's building. Namini found $250 in cash in the mailbox. In December 2016 Namini texted the renter twice to say he had not received any payments since October 2016. Namini texted the renter two more times in February 2017. The renter did not respond to any of Namini's texts or calls.

B. *Namini Tries To Dispose of the Porsche*

In October 2017 Namini removed the padlock and saw the Porsche. He thought it was "a piece of junk." Using the Porsche's vehicle identification number (VIN), Namini filed a request for vehicle information with the DMV to discover the Porsche's owner. The DMV rejected the request with the comment: "Please explain what the vehicle has to do with the rented garage. If you need to do a lien sale use the enclosed form." Namini consulted an attorney, who advised him to put a three-day notice to quit on the garage door. In December 2017 Namini posted a three-day notice to quit, but the renter did not respond. Namini asked a tow company to take the Porsche to a junkyard,

3

but the tow company told Namini that it could not tow the car unless he proved he was the owner.

Namini hired a lien sales company to file a lien sale application with the DMV.  The company filed the application in April 2018, but omitted the last two digits of the VIN.  The DMV rejected the application.  In June 2018 the company filed a second application on Namini's behalf with the full VIN.  Namini also filed a vehicle transfer form stating he sold the Porsche to himself for $50.

When Namini went to the DMV to transfer ownership of the Porsche to himself, the DMV matched the VIN to the police department's stolen vehicle record and contacted the California Highway Patrol (CHP).  CHP officers visited Namini, told him the Porsche was stolen, and asked how it ended up in his garage.  Namini told the officers about the anonymous renter who left the car and disappeared.  Namini did not show the officers the text message from the renter or give them the renter's phone number.

CHP towed the Porsche to a yard and told Saenz the Porsche had been located.  Saenz came to the tow yard and identified the Porsche as Beck's.  The Porsche had been stripped.  The car was missing its top, air conditioning, battery, tool kit, carpeting, door handle, back seat, door panels, and speakers.  At the tow yard Saenz met Namini, who asked for $15,000 for unpaid rent for the garage.  Saenz offered Namini twice that, $30,000, to "just get this done."  Namini said that he wanted to think about it and that he was not sure Saenz was the true owner of the car.  Namini took a picture of Saenz's identification; when Saenz asked for a picture of Namini's identification, Namini laughed and walked away.

CHP officers tried to determine whether Beck owned the car. Saenz showed them documents connecting the Porsche to Beck, including the police report, photographs, repair receipts, and automobile insurance documents. However, because Saenz did not have a certificate of title or registration for the Porsche, and the DMV did not have a registration record for the car,[1] the officers could not determine whether Beck was the legal owner of the Porsche. CHP closed its investigation, and the officers told Saenz that, to recover the car, Beck would need to prove ownership through the DMV. The tow yard released the Porsche to Namini, who returned it to his garage unit.

C.    *Beck Files This Action Against Namini*

In 2018 Beck filed this action against Namini and the DMV. Beck sought various forms of equitable relief to establish her ownership of the Porsche, including a writ of possession, injunctive relief preventing Namini from removing or transferring title to the Porsche, declaratory relief, and quiet title. She also asserted a cause of action against Namini for damage to personal property. Beck alleged that, although Namini knew or should have known the Porsche was stolen, he attempted to place a lien on the Porsche, wrongfully possessed it, and caused damage to it.[2]

---

[1]    Beck testified that, at some point after she registered the Porsche as non-operational, the DMV stopped sending registration notices, and she stopped paying registration fees.

[2]    Beck also sought an injunction preventing the DMV from transferring title to the Porsche. The DMV is not a party to this appeal.

5

The trial court issued a temporary restraining order enjoining Namini from "selling, encumbering, impairing the value, transferring, registering, harming, tampering, and/or destroying" the Porsche and enjoining the DMV from transferring title. The court also issued an order to show cause why the court should not issue a preliminary injunction. Namini did not oppose Beck's request for a preliminary injunction, which the trial court granted.

D.     *The Trial Court Rules for Beck and Awards Damages*

The case proceeded to a court trial. After Beck presented her evidence, Namini moved for judgment under Code of Civil Procedure section 631.8. Counsel for Namini stated Namini was "willing to return the vehicle," but argued there was no evidence Namini damaged it. Counsel for Beck argued there was evidence Namini "may be a part of the original criminal activity associated with the stolen vehicle." The trial court denied the motion for judgment (a ruling Namini does not challenge).

The trial court found in favor of Beck on all causes of action. The court issued Beck a writ of possession, permanently enjoined Namini from selling or transferring ownership of the Porsche to anyone other than Beck, quieted title to the Porsche, and issued a declaration Beck was the owner of the Porsche. On Beck's cause of action for damage to personal property, the court ruled "Beck carried her burden of proof to show that [Namini] damaged [Beck by] wrongfully possessing" the Porsche. The court awarded Beck $70,000 for the cost of restoring the Porsche, $50,000 for loss of use and enjoyment of the car, and $250,000 in punitive damages.

6

Namini filed a motion for a new trial, which the court denied. Namini timely appealed from the ensuing judgment.

## DISCUSSION

A. *Substantial Evidence Supported the Trial Court's Findings on Beck's Cause of Action for Damage to Personal Property*

1. *Standard of Review*

On appeal from a judgment based on a statement of decision following a court trial, we "review questions of law de novo and we review the trial court's findings of fact under the substantial evidence standard." (*Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791-792; see *Rojas v. HSBC Card Services Inc.* (2023) 93 Cal.App.5th 860, 872-873.) "We construe findings of fact liberally to support the judgment; consider the evidence in the light most favorable to the judgment; draw all reasonable inferences in support of the findings; and infer that the trial court "'impliedly made every factual finding necessary to support its decision.'"" (*Gajanan*, at pp. 791-792; see *Rojas*, at p. 873.) We must "give deference to the factual findings made by the trial court, where there is substantial evidence supporting them." (*Greif v. Sanin* (2022) 74 Cal.App.5th 412, 442.)

7

2.	*Substantial Evidence Supported the Trial Court's Findings Namini Wrongfully Possessed and Damaged the Porsche*

Namini argues the trial court erred in ruling in favor of Beck on her cause of action for damage to personal property.  He contends substantial evidence did not support the trial court's findings he wrongfully possessed and damaged the Porsche.  Substantial evidence, however, supported the court's findings.

Although no direct evidence connected Namini to the burglary, circumstantial evidence supported the inference he knew he received and was storing a stolen car.  (See *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54 ["Substantial evidence includes circumstantial evidence and reasonable inferences flowing from it."]; *Maaso v. Signer* (2012) 203 Cal.App.4th 362, 371 ["Substantial evidence includes reasonable inferences drawn from the evidence in favor of the judgment."].)  A stolen, stripped Porsche sat in his garage for over a year, and Namini's account of how it ended up there was suspicious.  Although Namini usually used a broker to rent his properties, this time he dealt directly with the renter.  Namini said he did not know the name of the man who rented the garage and had no way of identifying him.  The renter paid in cash; he started to fill out a rental application, but did not complete it; and Namini lost the (partial) application.  Namini did not see the renter tow the Porsche into the garage or put a padlock on the door.  The trial court "found [Namini's] testimony regarding an unknown person unpersuasive" and "did not find it credible when Namini testified that the 'white man' that responded to his [online advertisement] for the parking space started to fill out an application but did not fill out any of it."  (See *Maaso*, at p. 371

8

[trier of fact may draw an inference from a party's failure to explain adverse evidence or facts].) We do not question the trial court's credibility findings. (See *Greisman v. FCA US, LLC* (2024) 103 Cal.App.5th 1310, 1322 ["'we defer to the trier of fact on issues of credibility'"].)

Namini's behavior after the renter disappeared was similarly incongruous. The renter stopped paying rent after two months, yet Namini waited another 12 months (while locked out of his garage unit and losing $250 in monthly rental income) before removing the lock, discovering the Porsche, and filing a request with the DMV to find the owner. When CHP officers told Namini the car was stolen, Namini never gave them the renter's telephone number—something the trial court found "one of the most damaging" pieces of evidence to Namini's credibility. Finally, when Namini met Saenz at the tow yard, Namini asked for $15,000 in exchange for the car, three times the $5,000 due for 20 months' rent. And then turned down $30,000 for a car he claimed he didn't want and put it back in his garage unit so that he would lose the opportunity of re-renting the space.

Namini argues substantial evidence did not support the trial court's findings because the court "expressly rejected" Beck's theory Namini "was part of a criminal conspiracy to steal" the Porsche. Pointing to the trial court's statement at the hearing on his motion for a new trial that the court "believed" Namini, he contends the court "found no misconduct in renting the storage unit." The record does not support Namini's assertion the court found he was entirely innocent in renting the garage to the mysterious renter. As discussed, in its statement of decision the court stated it did not believe Namini's testimony about the unidentified renter. In the context of the entire hearing on the

9

motion for a new trial, the court's statement it "believed" Namini appeared to emphasize the past tense of the verb and to mean that the court initially believed Namini when he testified about how the car arrived in his garage, but that Namini's failure to give law enforcement the renter's phone number caused the court to lose confidence in Namini's story. (See *Burch v. CertainTeed Corp.* (2019) 34 Cal.App.5th 341, 348 [we "indulge all reasonable inferences in support of the judgment"].)

Namini concedes "the Porsche was damaged between the time it was stolen in March 2016 and the time of trial in 2023," but he argues substantial evidence did not support the court's finding he caused the damage. Namini argues there was no evidence that he "was involved in the theft, that he personally 'stripped' the vehicle, or that he had any incentive to do so." He also maintains the court "did not find that [he] was involved in the burglary."

But although the trial court did not expressly find Namini was involved in the burglary, as discussed the court impliedly found he knew he was receiving stolen property. Beck did not have to prove Namini was, as he puts it, "part of a criminal scheme to steal and strip the vehicle." She had to prove only that Namini's conduct was a substantial factor in causing the damage to the Porsche. (See *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co., Inc.* (2018) 5 Cal.5th 216, 223 ["Causation is established for purposes of California tort law if the defendant's conduct is a 'substantial factor' in bringing about the plaintiff's injury."].) Nor did Beck have to prove, as Namini contends, "that acts of Namini—as opposed to acts of the burglars—were the probable cause of damage to the vehicle." Namini could be liable even if he did not personally steal or strip

10

the Porsche.  (See *Huang v. The Bicycle Casino, Inc.* (2016) 4 Cal.App.5th 329, 348 ["'a defendant cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the plaintiff's harm'"]; see also *Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings, Inc.* (2019) 36 Cal.App.5th 766, 792 ["a substantial factor need not be the only factor contributing to the plaintiff's alleged harm"].)  In any event, though Namini testified he did not strip or damage the car, we defer to the trial court's finding Namini's testimony was not credible.  (See *In re George T.* (2004) 33 Cal.4th 620, 634 ["[b]ecause the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review"]; *Smith v. Novato Unified School Dist.* (2007) 150 Cal.App.4th 1439, 1454 [same].)

Namini's dubious account of how the Porsche ended up in his garage—and remained for a year before he finally got around to opening the unit—was substantial evidence that, even if he was not involved in stealing the Porsche, he knew he was storing stolen property.  (See *People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574-1575 ["Possession of recently stolen property," along with "an unsatisfactory explanation, or . . . other suspicious circumstances," justifies an inference the possessor knew the property was stolen.]; *People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1019-1020 [defendant's knowledge property was stolen may be "inferred from the defendant's failure to explain how he came to possess a stolen item or his offer of an unsatisfactory explanation or from suspicious circumstances attendant upon his possession of the item"]; see also *People v. Beltran* (2007) 157 Cal.App.4th 235, 241 [jury may "reasonably infer that a

11

secondhand dealer who fails to make reasonable inquiry when obtaining stolen property under suspicious circumstances knew that the property was stolen"].)  And if Namini assisted the burglars by providing a place to hide the stolen Porsche, his conduct was a substantial factor causing damage to the car.  (See *Beebe v. Wonderful Pistachios & Almonds LLC* (2023) 92 Cal.App.5th 351, 370, internal quotations omitted ["The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical."]; see also *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 198 ["proximate cause is ordinarily a question of fact"]; *Hoyem v. Manhattan Beach City School Dist.* (1978) 22 Cal.3d 508, 520 ["[p]roximate cause . . . is generally a question of fact"].)

Namini argues that there was no evidence he "was in any way untruthful to the authorities" and that the trial court's focus on his failure to give law enforcement the renter's contact information improperly imposed on Namini a "duty to report a suspected crime."  But even if Namini had no duty to volunteer information to law enforcement, the trial court could reasonably conclude that someone who unwittingly ended up with a stolen car in his garage, and who wanted the car gone and the owner identified (yet who refused to return it to the owner for $30,000), would have given the police the telephone number of the person who delivered the stolen property.  The trial court, in assessing Namini's credibility, properly considered Namini's failure to provide any information about the supposed renter.

B.    *The Trial Court Erred in Awarding Damages for Loss of Use of the Porsche*

Namini argues that, because Beck did not drive the Porsche, the trial court erred in awarding her $50,000 in damages for loss of use.  Namini is correct.

The proper measure of tort damages "is the amount which will compensate for all the detriment proximately caused."  (Civ. Code, § 3333.)  "'Tort damages are awarded to fully compensate the victim for all the injury suffered.'"  (*Metz v. Soares* (2006) 142 Cal.App.4th 1250, 1255; accord, *Berger v. Varum* (2019) 35 Cal.App.5th 1013, 1020.)

Where a defendant deprives a plaintiff of the use of the plaintiff's vehicle, the court may award damages for loss of use in the amount of the vehicle's reasonable rental value.  (See *Reynolds v. Bank of America* (1959) 53 Cal.2d 49, 50 ["where a vehicle is injured by the wrongful act of another, the owner is entitled to recover for the damage done to the vehicle and also for the loss sustained by being deprived of its use during the time reasonably required for the making of repairs"]; *Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 818 [the "value of the 'loss of use' of the car is the rental value of a substitute vehicle"]; *Harris v. Dixon Cadillac Co.* (1982) 132 Cal.App.3d 485, 488, 491 [awarding loss of use damages against a defendant who wrongfully detained the plaintiff's car after she refused to pay a repair bill she claimed she did not authorize]; *Fresno City Lines v. Herman* (1950) 97 Cal.App.2d 366, 372 [bus owner was entitled to reasonable rental value for his bus for loss of use while it was being repaired].)

However, there is an exception to that rule:  "One who does not use a car is not entitled to damages for loss of use."  (*Metz*

13

*v. Soares, supra,* 142 Cal.App.4th at p. 1252.)  In *Metz* the plaintiff's classic 1971 Jaguar was ruined after it was exposed to the elements at the defendant's repair shop.  (*Id.* at p. 1251.)  Alleging the defendant wrongfully detained his car, the plaintiff sought damages for property damage and loss of use.  (*Id.* at p. 1252.)  But the plaintiff admitted that he "took his car out of service" five years before he took it to the defendant's shop and that the car was registered as non-operational.  (*Id.* at p. 1257.)  The court held that the trial court in that case properly "instructed the jury that to receive damages for loss of use, plaintiff would have to prove he lost the use of the Jaguar for a specific period of time due to defendant's fault," but that the plaintiff "failed to do so because he did not prove use of the car at any ascertainable time for five years before he entrusted it to defendant and did not prove he had even wanted to use the car during the four years it sat in defendant's shop."  (*Id.* at p. 1258.)

Beck testified she stopped driving the Porsche in the late 1980's, registered it as non-operational, and stored it at her home.  Because Beck had not driven the Porsche for more than 25 years before it was stolen, Namini's conduct did not deprive her of the use of the Porsche, and she cannot recover damages for loss of use.

C.    *The Trial Court Erred in Awarding Damages for the Cost of Repair*

Namini argues the trial court erred in awarding Beck the cost to repair the damage to the Porsche, rather than the diminution in the car's value.  Namini is correct again.

A plaintiff may recover as damages for tortious injury to personal property either "'the *depreciation in value* (the measure

14

being the difference between the value immediately before and after the injury) . . .'" or "the reasonable cost of repairs." (*Hand Electronics, Inc. v. Snowline Joint Unified School Dist.* (1994) 21 Cal.App.4th 862, 870.)  "If the cost of repairs exceeds the depreciation in value, the plaintiff may only recover the lesser sum." (*Ibid.*; see *Pacific Gas & Electric Co. v. Mounteer* (1977) 66 Cal.App.3d 809, 812 ["the measure of damages for tortious injury to personal property is the difference between the market value of the property immediately before and immediately after the injury, or the reasonable cost of repair if that cost be less than the diminution in value"]; *Smith v. Hill* (1965) 237 Cal.App.2d 374, 388 [same].)

Beck called as a witness an automotive appraiser, who testified that, before the Porsche was stolen, it was worth $162,175 and that the Porsche's value at the time of trial was $130,175 (a diminution in value of $32,000).  The expert also testified it would cost between $50,000 and $70,000 to restore the Porsche to its pre-burglary condition.  The trial court awarded Beck $70,000 for the cost to restore the Porsche.  Because the diminution in value ($32,000) was less than the cost of repair ($70,000), the trial court erred in awarding damages for the cost of repair.  (See *Hand Electronics, Inc. v. Snowline Joint Unified School Dist.*, *supra*, 21 Cal.App.4th at p. 870.)

Beck argues the rule a plaintiff may recover only the lesser of the diminution in market value and the cost of repair is not absolute.  She cites *Heninger v. Dunn* (1980) 101 Cal.App.3d 858, at page 863, for the proposition restoration costs "may be awarded even though they exceed the decrease in market value if 'there is a reason personal to the owner for restoring the original condition' [citation], or 'where there is reason to believe that the

15

plaintiff will, in fact, make the repairs.'" *Heninger* and the other cases Beck cites, however, address the measure of damages for damage to real property, not personal property. (See *Heninger*, at p. 864 [the "'personal reason' exception has been invoked in many jurisdictions in cases involving destruction of shade or ornamental trees that were of personal value to the owner"]; see also *Salazar v. Matejcek* (2016) 245 Cal.App.4th 634, 644 [trial court did not err in awarding restoration costs where the "'trees were valuable to [the plaintiff] for aesthetic reasons'" and it was likely the plaintiffs "would restore the denuded property"]; *Kallis v. Sones* (2012) 208 Cal.App.4th 1274, 1280 ["Given the personal value placed on the tree by [the] plaintiffs and the likelihood that they would restore a tree of similar size, the trial court's decision to award restoration costs was proper."]; *Orndorff v. Christiana Community Builders* (1990) 217 Cal.App.3d 683, 687 [homeowners with "a personal reason to repair" were entitled to recover cost to repair a house damaged by defectively compacted soil rather than the smaller diminution in value].)

Beck cites no case applying the "personal reason" exception to personal property. In *Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, a case (not cited by Beck and) involving damage to trees, the court held the trial court in that case erred in instructing the jury on the measure of damage to personal property rather than real property. (*Id.* at p. 167.) The trial court erroneously instructed the jury with BAJI No. 14.20, which stated the measure of damage to personal property was "the difference in the fair market value of the property," unless the damage could be repaired "at a cost less than the difference in

16

value."[3]  In contrast, the court in *Hassoldt* stated, where the case involves real property, the plaintiff may recover costs of restoration even if they exceed the decrease in market value, if the owner has a personal reason for the restoring the property or if there is reason to believe the owner will make the repairs. (*Hassoldt*, at p. 168.)

Beck sought damages to personal property.  The cost of repairing that property, the Porsche, exceeded its diminution in market value.  The trial court should have awarded the latter ($32,000), not the former ($70,000), regardless of whatever personal reasons Beck may have had for fixing the (non-operational) Porsche.

### D.  *The Trial Court Erred in Awarding Punitive Damages*

Namini argues Beck did not present sufficient evidence of his financial condition to support the trial court's award of punitive damages.  That's a hat trick for Namini.

"[A]n award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109; see *Garcia v. Myllyla* (2019) 40 Cal.App.5th

---

[3]  CACI No. 3903J, the pattern jury instruction for damage to personal property, similarly states a plaintiff may recover damages for harm to personal property in the amount of the reduction in the item's value "or the reasonable cost of repairing it, whichever is less."  CACI No. 3903F, the pattern jury instruction for damage to real property, includes an optional instruction on the "personal reason" exception; CACI No. 3903J does not.

17

990, 995 ["A plaintiff who seeks punitive damages ordinarily must introduce evidence of a defendant's net worth."].) "'Although net worth is the most common measure of the defendant's financial condition, it is not the only measure for determining whether punitive damages are excessive in relation to that condition.'" (*Doe v. Lee* (2022) 79 Cal.App.5th 612, 620; see *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 691.) ""'What is required is evidence of the defendant's ability to pay the damage award,'"" regardless of the measure used. (*Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 452; see *Baxter*, at p. 680.) A "'plaintiff who seeks to recover punitive damages must bear the burden of establishing the defendant's financial condition.'" (*Reliant Life Shares, LLC v. Cooper* (2023) 90 Cal.App.5th 14, 42; see *Adams*, at p. 123.)

"'[I]n most cases, *evidence of earnings or profit alone*'" is "'*not sufficient "without examining the liabilities side of the balance sheet."'* . . . '*Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income.*'" (*Doe v. Lee, supra,* 79 Cal.App.5th at p. 621; see *Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680.) "We may not infer sufficient wealth to pay a punitive damages award from a narrow set of data points, such as ownership of valuable assets." (*Farmers & Merchants Trust Co. v. Vanetik* (2019) 33 Cal.App.5th 638, 648.)

Beck did not meet her burden to prove Namini's ability to pay punitive damages in the amount of $250,000. The only evidence of Namini's ability to pay was that he owned three buildings: an apartment building with eight tenants and five rented garage units, a multiplex with six tenants where he lived,

18

and a two-unit property he bought for his daughter.[4]  There was no evidence of the value of the properties, how much rental income they generated, the expenses associated with the properties, or whether the properties were encumbered.  Nor was there any other evidence of Namini's income or liabilities.  That he owned three properties, without more, was not sufficient evidence of Namini's ability to pay $250,000 in punitive damages.  (See *Farmers & Merchants Trust Co. v. Vanetik*, *supra*, 33 Cal.App.5th at p. 650 [valuation of the defendant's home was not sufficient evidence of financial condition, absent evidence whether there were liens on the property]; *Baxter v. Peterson*, *supra*, 150 Cal.App.4th at p. 681 [although the evidence showed the defendant owned several properties, there was "no evidence regarding the value of these properties, the amount of income they generate, the extent to which they are mortgaged or otherwise encumbered, or whether [the defendant] 'operates' her rental houses at a profit"]; *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 917 [defendant's statement he had several hundred thousand dollars in equity in two properties was not "meaningful evidence of [the defendant's] financial condition or ability to pay" punitive damages because the plaintiff did not introduce evidence whether the properties were encumbered or whether the defendant had other liabilities]; see also *Soto v. BorgWarner*

---

[4]    Beck asserts that Namini testified he owned "18 apartment buildings" and that his lawyer "sought to recharacterize his answers as referring to 18 units in one building, rather than 18 separate buildings."  But it was counsel for Beck who elicited Namini's testimony he owned "18 apartment buildings" and, recognizing Namini had misspoken, continued questioning Namini as if he had said he owned a building with 18 units.

19

*Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 195 [evidence of the corporate defendant's revenue stream "was, at best, pertinent to only half of [the defendant's] balance sheet and therefore was not, standing alone, meaningful evidence of [the defendant's] financial condition"].)

Beck suggests Namini's failure to testify his properties were encumbered is evidence they were not. She argues "a defendant has no obligation to testify regarding his financial condition, but when he does, courts may conclude it presents a complete and accurate description and may therefore rely on it." Beck does not cite any part of the record where either attorney asked Namini whether his properties were encumbered or more generally to describe his financial condition. And as discussed, it was Beck's burden, not Namini's, to introduce evidence of Namini's financial condition. (See *Reliant Life Shares, LLC v. Cooper*, *supra*, 90 Cal.App.5th at p. 42; *Doe v. Lee*, *supra*, 79 Cal.App.5th at p. 623.)

## DISPOSITION

The judgment is modified to award Beck damages in the amount of $32,000.  As modified, the judgment is affirmed.  The parties are to bear their costs on appeal.


SEGAL, J.


We concur:


MARTINEZ, P. J.


PULOS, J.*

---

\*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.